Michael I. Levin, Esq.
Andria B. Saia, Esq.
Stacy G. Smith, Esq.
LEVIN LEGAL GROUP, P.C.
1402 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA  19006
Tel. (215) 938-6378

Attorneys for Defendants:
Montgomery County Community College;
Vincent Martello; Matthew Kroner; and,
Clifford Barcliff

**IN THE UNITED STATED DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ARTHUR HERRING, III** | : | |
| | : | |
| **Plaintiff** | : | Civil Action |
| | : | 02-CV-02811 |
| **v.** | : | |
| | : | |
| **VINCENT MARTELLO, MATTHEW KRONER, CLIFFORD BARCLIFF, MONTGOMERY COUNTY COMMUNITY COLLEGE, WHITPAIN TOWNSHIP, JOSEPH STEMPLE, WILLIAM BUNTING and GEORGETTE JACOB.** | : : : : : : : | |
| | : | |
| **Defendants** | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
PETITION TO ENFORCE SETTLEMENT AGREEMENT**

Defendants Vincent Martello (hereinafter "Martello"), Matthew Kroner, (hereinafter, "Kroner"), Clifford Barcliff, (hereinafter "Barcliff"), Montgomery County Community College (hereinafter "Community College") (collectively, the "College Defendants"), by and through their undersigned counsel, hereby offer the following Memorandum of Law in Opposition to Plaintiff's Petition to Enforce Settlement Agreement ("Petition").

**LEGAL ARGUMENT:**

**A.      Pennsylvania Law Governs.**

The threshold question presented by Plaintiff's Petition is what substantive law governs a dispute over a settlement agreement which releases both state and federal claims. *See Tiernan v. DeVoe,* 923 F.2d 1024, 1032 (3d Cir. 1991). Because Plaintiff's Complaint raises both state and federal claims, this Court must look to state substantive law to determine the validity of the purported settlement agreement. *Id.* at 1033 ("Under Pennsylvania's choice-of-law rules, applicable law is that of place with most significant relationship to parties and transaction. It would be illogical to consider the viability of the settlement agreements as to different claims under different [state and federal] standards"). Consequently, Pennsylvania law regarding the validity and enforceability of settlements controls. *Id.*

**B.      Pennsylvania Standards for the Validity of a Purported Settlement.**

Under Pennsylvania law, the enforceability of settlement agreements is governed by principles of contract law. *Mazzella v. Koken,* 739 A.2d 531, 536 (Pa. 1999). To be enforceable, a purported settlement agreement must possess all of the elements of a valid contract. *Id.* "It is black letter law that in order to form an enforceable contract, there must be an offer, acceptance, consideration or mutual meeting of the minds." *Jenkins v. County of Schuylkill,* 658 A.2d 380, 383 (Pa. Super. 1995). "As with any contract, it is essential to the enforceability of a settlement agreement that 'the minds of the parties should meet upon all the terms, as well as the subject-matter, of the [agreement].'" *Id.* (quoting *Onyx Oils & Resins, Inc. v. Moss,* 80 A.2d 815, 817 (Pa. 1951)). It is also well settled that absent a manifestation of an intention to be bound, negotiations concerning terms of a possible future contract do not result in an enforceable agreement. *Jenkins,* 658 A.2d at 383.

The legal test for determining the existence of a settlement agreement, therefore, is straightforward. "If all of the material terms of a bargain are agreed upon, the settlement agreement will be enforced." *Mazzella,* 739 A.2d at 537. "If, however, there exist 'ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce,' such an agreement must be set aside." *Id.* (quoting *Miller v. Clay Township,* 555 A.2d 972, 974 (Pa. Cmwlth. 1989)).

When there is no dispute as to the existence of a settlement, no hearing is necessary and the court may summarily enforce the settlement. *See Tiernan,* 923 F.2d at 1031. However, "where material facts concerning the *existence* or *terms* of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Id.* (quoting *Callie v. Near,* 829 F.2d 888, 890 (9th Cir. 1987)) (emphasis in original). Moreover, when "there exists conflicting evidence as to whether the parties intended that a particular writing would constitute a complete expression of their agreement, the parties' intent is a question to be resolved by the finder of fact." *Mazzella,* 739 A.2d at 536.

    **i.    There Was No "Mutual Meeting of the Minds" on Material Terms and, Therefore, No Settlement Agreement.**

As the above-cited cases make abundantly clear, there can be no settlement agreement if there has been no mutual meeting of the minds upon: (1) all of the material terms; and, (2) the subject matter, of the purported settlement agreement. *See, Mazzella, supra.* If there is no agreement on a material term of a purported settlement, then there is no mutual meeting of the minds and, therefore, no enforceable contract. *See Porreco v. Maleno Developers, Inc.,* 761 A.2d 629 (Pa. Cmwlth. 2000).

The Pennsylvania Commonwealth Court explained what constitutes a "material" term of a purported settlement agreement in *Porreco.* In that case, parties to a lawsuit related to storm

3

water runoff damage informed the trial court that a settlement had been reached. *Id.* at 631. Part of the purported settlement agreement involved the construction of a water retention basin. *Id.* When the parties where unable to reach an agreement regarding the standards for construction of the water retention basin, one of the parties filed a petition to enforce a settlement agreement. *Id.* The trial court granted the petition to enforce the settlement agreement, which the Commonwealth Court vacated on appeal. *Id.* at 633. Preliminary, the court noted, "[t]he mere fact that the parties reported to the court that they had reached a settlement agreement is not dispositive." *Id.* The court held that the construction standards for the retention basin "[went] to the essence of the tentative settlement agreement and [affected] every aspect of it." *Id.* Consequently, the court held, "[t]he parties' failure to resolve this crucial term renders their tentative agreement impossible to interpret and/or to enforce." *Id.*

In the instant situation, the conduct of settlement negotiations clearly indicates that the parties had not reached a mutual meeting of the minds on "crucial" terms – terms essential to a settlement that would affect every aspect of it. Plaintiff claims to have set forth the terms of the agreement in his June 3, 2003, letter, however this is clearly not true from the very letter he cites as evidence. The June 3rd letter contains no language as to the released claims, which of course is the College's consideration for settling the matter. In fact, the June 3rd letter does not even state the ultimate material term for the Defendants, namely Plaintiff will withdraw the instant law suit! Further, the June 3rd letter does not discuss Plaintiff's cooperation in filing whatever paperwork would be necessary to remove the default judgments entered against two of the College Defendants, Martello and Kroner so that a global settlement could be achieved. *See* Exhibit "B" to Plaintiff's Petition, as in the proposed RSA sent by the College Defendants and later agreed to by Plaintiff. Lastly, the June 3rd letter specifically states "If this is not in

conformity with what everybody's understanding is of what has been agreed upon, please contact me immediately." In response to the letter, the proposed RSA was sent which contained all of the material terms, not just the ones Plaintiff cared about, namely how much money he would receive.

When Plaintiff's counsel reviewed the College Defendants' proposed RSA, he responded in a letter of June 27, 2003, that it contained "other things in there that we did not talk about such as opening default judgments against Martello and Kroner." *See* Exhibit "B" to the College Defendants' Answer to Plaintiff's Petition. How could the parties have already achieved a "mutual meeting of the minds" on June 3rd as to all of the crucial, essential terms to a settlement agreement if, as Plaintiff's counsel's June 27th letter concedes, the parties had not yet even resolved the fundamental issue of Plaintiff's agreement to assist in the lifting of the default judgments against Martello and Kroner? Indeed, what rational parties would have agreed to a settlement, where there were already default judgments entered against them, where there was no provision in the purported settlement "agreement" regarding the elimination of the judgments? Most critical, however, is that the counsel for the College Defendants clearly stated to Plaintiff's counsel that agreement on a settlement would be conditioned a mutually acceptable written release and settlement agreement. *See* Defendants' Answer to Plaintiff's Petition to Enforce Settlement Agreement, ¶ 5.

What this course of dealings demonstrates is that the parties did not have a settlement agreement as of June 3rd, and that crucial, essential terms remained for the parties to negotiate before a final settlement agreement could be reached.[1] When Plaintiff's counsel rejected the

---

[1] As evidenced by Plaintiff's counsel's June 27th letter, Plaintiff's counsel ultimately accepted this portion of the College Defendants' proposed RSA. Plaintiff's response, however, that this represented a term that the parties "did not talk about" indicates that parties' settlement

5

College Defendants' proposed RSA, the parties' negotiations ended without a settlement agreement.

As the Pennsylvania Supreme Court's decision in *Mazzella v. Koken,* 739 A.2d 531 (Pa. 1999), makes clear, where one party rejects the terms proffered by the other party in proposed settlement agreement, there is no meeting of the minds and, consequently, no settlement agreement. In *Mazzella,* the parties to an insurance company liquidation proceeding advised the court during a settlement conference that they had reached a settlement agreement. *Id.* at 533. The parties' exchanged correspondence outlining the terms of the proposed settlement, including agreement on: (1) withdrawal of pending litigation; (2) distribution of surplus assets of the liquidated insurance company; and, (3) the filing of a petition to distribute the insurance company's surplus assets. *Id.* Plaintiff's counsel then forwarded a draft settlement agreement to the adverse party, the Pennsylvania Insurance Commissioner. The Insurance Commissioner, however, made several revisions to the plaintiff's proposed settlement agreement and returned the revised settlement agreement to plaintiff; plaintiff refused to sign the revised settlement agreement. *Id.* at 534. The Insurance Commissioner then filed a petition to enforce the purported settlement agreement, which the Commonwealth Court granted. *Id.* at 535. On appeal, the Supreme Court reversed, summing up the course of dealings between the parties as follows:

> [t]he draft agreement sent by [plaintiff] to the [Insurance Commissioner] in January of 1994 was simply an offer, and the [Insurance Commissioner's] response, because it contained terms that varied from those of [plaintiff's] draft, was a counter-offer, the effect of which was to terminate the original offer. The parties did not reach an enforceable settlement agreement in December of 1993 or

---

negotiations had not resolved all of the crucial, essential, material terms necessary for a meeting of the minds on a settlement agreement as of June 3rd – the date Plaintiff contends that the parties reached a "global" settlement agreement.

6

>   thereafter, since, as revealed by the January and February drafts, there was no meeting of the minds with regard to a material term of the proposed agreement.

*Id.* at 538.

What has occurred between the parties in the instant matter is precisely what occurred in *Mazzella*. During negotiations, the parties agreed to certain general terms of a settlement agreement; however, consummation of a settlement agreement was conditioned on the parties' mutual agreement on all of the terms of a written release and settlement agreement. In response to the oral settlement discussions, the College Defendants' attorneys prepared the proposed RSA that incorporated all of the essential, material terms acceptable to both the College Defendants and the Township, and forwarded this to Plaintiff's counsel to see if the terms were acceptable to Plaintiff. The material terms and conditions in the proposed RSA that were essential to the College Defendants' agreement to settle included: (1) the requirement that Plaintiff cooperate in removing the default judgments that had already been entered against two of the Defendants, Martello and Kroner, who were to be "released parties" in the settlement; (2) a provision that Plaintiff keep the terms of the settlement confidential; and, (3) with regard to Plaintiff's agreement not to enter the Community College's premises with "guns," a more concrete and comprehensive definition of this term, with reference to a specific statutory definition of "weapons," and (4) a release of all claims. This proposed RSA constituted the College Defendants' offer to settle. Plaintiff's rejection of this proposed RSA – due primarily to the inclusion of a confidentiality provision and a prohibition on Plaintiff's carrying weapons onto the Community College's premises – constituted a counter-offer, which terminated the College Defendants' settlement offer. *See* Exhibit "B" to Defendants' Answer to Plaintiff's Petition to Enforce Settlement. Because the College Defendants insisted on the terms regarding confidentiality and no "weapons" in the proposed RSA, they could not agree on revisions to the

7

proposed RSA that were contained in Plaintiff's counsel's letter of June 27th. As a result, "there was no meeting of the minds with regard to a material term of the proposed agreement," and, hence, no agreement. *See Mazzella,* 739 A.2d at 538. However unfortunate that Plaintiff would not accept the conditions contained in the College Defendants' proposed RSA, Plaintiff cannot now be allowed to "cram down" the throats of the College Defendants a "settlement" that was never agreed to by them and that, in fact, represents only a portion of the terms agreed upon during settlement negotiations.

      **ii.    Agreement on Terms During Settlement Negotiations Does Not Constitute a Settlement Agreement.**

It is well settled that absent a manifestation of an intention to be bound, negotiations concerning the terms of a possible future agreement do not result in an enforceable agreement. *See Jenkins, supra.* Nor does agreement, during the course of negotiations, on certain terms to be included in a settlement agreement mean that the parties have reached a settlement agreement. One of the principal cases relied on by Plaintiff, in fact, illustrates this principle. In *Max Control Systems, Inc. v. Industrial Systems, Inc.*, 2001 WL 1160760 (E.D. Pa. July 30, 2001), the parties advised the Court in March of 2000 that they had reached a settlement and, accordingly, the Court entered a Rule 41.1(b) Order. The parties in *Max Control Systems* reached agreement on the overall amount of the settlement ($70,000) but, at the time that the parties advised the Court of an agreement to settle, they had not even discussed critical settlement issues, such as indemnification, the scope of the releases between the parties and the scope of the issues settled. *Id.* at *2. Plaintiff subsequently sought enforcement of the purported settlement agreement, which the Court denied, holding "the amount for settlement of the claims was settled at $70,000 but the parties had no meeting of the minds as to remaining issues which would settle the entire matter." *Id.* Among the reasons why the Court concluded that the parties had failed to reach a

8

settlement agreement was that "[t]he issue of indemnification remained an important matter to resolve." *Id.*

Plaintiff distinguishes *Max Control Systems* from this instant situation because, in that case, a letter from defense counsel referring to the $70,000 settlement agreement specifically stated, "[r]emaining to be determined are the scope of the releases between the parties as well as the scope of the issues settled." *Id.* Plaintiff contends that in *Max Control Systems*, there were "open issues" reflected in defense counsel's letter, whereas Plaintiff's own June 3rd letter ostensibly proves that there were "no such open issues." Aside from the fact that in *Max Control Systems* the plaintiff was relying on the **defendant's** memorialization (i.e., letter) of the supposed settlement agreement, whereas Plaintiff presently relies on his own counsel's self-serving letter of June 3rd, as proof of an alleged oral settlement agreement, there are other circumstances that demonstrate that the parties had not reached a final settlement agreement, and that fundamental issues remained open. First, as alleged in Paragraph 5 of Defendants' Answer to Plaintiff's Petition, Plaintiff's counsel was made aware that a fundamental condition of a final settlement would be that the parties mutually agree on a written release and settlement agreement. Second, according to Plaintiff's counsel's own June 3rd letter, Plaintiff sought confirmation of the parties as to the agreement of the terms contained in the June 3rd letter, which the College Defendants did not, and would not, confirm until Plaintiff agreed to the proposed RSA that was sent to Plaintiff on June 25th. *See* Exhibit "A" to Defendants' Answer to Plaintiff's Petition. Moreover, to the extent that Plaintiff avers that his attorney's letter of June 3rd purports to memorialize a "global resolution" of "this matter, it should be clear from review of Plaintiff's counsel's one-page letter that only certain terms had been discussed and agreed upon, and that numerous crucial issues not even hinted at in Plaintiff's counsel's supposedly "confirming" letter had not

9

yet been resolved, namely, the scope of the releases (i.e., Plaintiff's agreement to cooperate in the elimination of the default judgments against Martello and Kroner), the nature of the claims released, and confidentiality.

Contrary to Plaintiff's counsel's suggestion that the College Defendants had a "change of heart" and were "avoiding the agreement that had earlier been struck," the College Defendants most definitely desired a final settlement of the matter and, as Plaintiff's counsel's letter of June 27th indicates, it is Plaintiff who balked at the essential terms of a settlement when Plaintiff rejected the College Defendants' proposed RSA. The situation was one that commonly occurs, where preliminary agreement on certain terms during negotiations of a settlement fail to result in a final, acceptable agreement. *See, e.g., Mazzella, supra.*; *Wilcher v. City of Wilmington,* 139 F.3d 366, 373 (3d Cir. 1998) ("Although the parties agreed in principle at the pre-trial teleconference to a stipulation permanently halting the direct observation procedure, they did not discuss the details of the agreement. Thus, we cannot say that all the essential terms were resolved before or during the teleconference. The teleconference represented but one step of a complex negotiation between three parties….").

Plaintiff in the case at bar consistently puts the cart before the horse: he assumes the existence of an agreement on June 3rd, and complains that all of the College Defendants' negotiations subsequent to that "agreement" were an attempt to violate the "agreement." The reality is that there was no agreement on June 3rd, only an agreement on certain terms of a possible settlement. There would, moreover, be no settlement agreement until the terms of a written settlement and release agreement could be agreed to that addressed: (1) Plaintiff's obligations to take steps necessary to lift the default judgments against the College Defendants; (2) the prohibitions on Plaintiff's possession of weapons at the Community College; and, (3)

confidentiality of the settlement. All of these conditions were essential, material terms for a settlement, which is why they appeared in the College Defendants' proposed RSA on June 25, 2003. When Plaintiff rejected some of these material terms (primarily confidentiality), this partial rejection of the proposed RSA amounted to a counter-settlement offer, which the College Defendants could not accept. Simply stated, the failure of a settlement is due to Plaintiff, not the College Defendants.

**CONCLUSION:**

WHEREFORE, for all the above reasons, the Community College, Barcliff, Martello and Kroner respectfully request that this Court hold that the parties failed to reach an agreement to settle the instant litigation and, therefore, deny Plaintiff's petition to enforce the non-existent settlement agreement.

Respectfully submitted,
LEVIN LEGAL GROUP, P.C.

_____
Andria B. Saia, Esquire
Stacy G. Smith, Esquire
1402 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006
215-938-6378

Date: _____

**CERTIFICATE OF SERVICE**

    I, Stacy G. Smith, hereby certify that I am this _____ day of July, 2003 serving the foregoing Answer to Plaintiff's Petition to Enforce Settlement Agreement and Memorandum of Law in Support of Defendant's Answer to Plaintiff's Petition to Enforce Settlement Agreement upon the person(s) and in the manner indicated below.

<u>Service by first class mail addressed as follows:</u>

Robert J. Magee, Esquire
WORTH, MAGEE & FISHER, P.C.
515 Linden Street
Third Floor
Allentown, PA 18101

Joseph J. Santarone, Esquire
MARSHALL, DENNEHEY, WARNER,
COLEMAN AND GOGGIN
One Montgomery Plaza, Suite 1002
Norristown, PA 19401-4814

BY: _____
      Stacy G. Smith